UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| Kelli Baugh and Justin Baugh, ) | Civil Action No.: 4:11-cv-525-RBH |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | **MEMORANDUM IN OPPOSITION OF** |
| Bayer Corporation; Bayer Healthcare, LLC; ) | **DEFENDANT BAYER HEALTHCARE** |
| Bayer Pharmaceuticals Corporation; Bayer ) | **PHARMACEUTICALS, INC.'S** |
| Healthcare Pharmaceuticals, Inc.; Berlex ) | **MOTION FOR SUMMARY JUDGMENT** |
| Laboratories, Inc.; and Berlex, Inc.; ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

Plaintiffs hereby respond in opposition to Defendant Bayer Healthcare Pharmaceuticals, Inc.'s Motion for Summary Judgment Based on the Statute of Limitations. For the reasons stated herein, Defendant's Motion should be denied.

**INTRODUCTION**

Throughout their brief, Defendants display their mistaken belief that Ms. Baugh's problems are limited to pain, excessive bleeding, and inability to have non-painful intercourse with her husband. Ms. Baugh's claims, however, arise from: 1) the perforation of the Mirena device; 2) her subsequent hysterectomy and removal of her ovaries and reproductive tract; and 3) the development of endometriosis and scar tissue in her abdominal cavity - all of which did not occur or were not discovered until within three years of the filing of her lawsuit.

**I.   STANDARD**

Defendants are entitled to summary judgment only where "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P.

56(a).  A fact is material "if proof of its existence or non-existence would affect disposition of the case under applicable law." *Melton v. Carolina Power & Light Co.*, 2012 U.S. Dist. LEXIS 87207, *4 (D.S.C. June 25, 2012) citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505 (1986). (Exh. 1)  "An issue of material fact is 'genuine' if the evidence offered is such that a reasonable jury might return a verdict for the non-movant." *Id.,* citing *Anderson*, 477 U.S. at 257.  When deciding on a summary judgment, "the nonmoving party is entitled 'to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, all internal conflicts in it resolved favorably to him, [and] the most favorable of possible alternative inferences from it drawn in his behalf." *Charbonnages de France v. Smith,* 597 F.2d 406, 414 (4th Cir. 1979).

Nor is summary judgment appropriate "even where there is no dispute as to the evidentiary facts but only as to the conclusions to be drawn therefrom." *Pierce v. Ford Motor Co.,* 190 F.2d 910, 915 (4th Cir. 1951).  In other words, summary judgment "should be granted only where it is perfectly clear that no issue of fact is involved and inquiry into the facts is not desirable to clarify the application of the law."  *Stevens v. Howard D. Johnson Co.,* 181 F.2d 390, 394 (4th Cir. 1950).  As detailed below, genuine issues of material fact exist and summary judgment is improper in this case.

## II. FACTS

Plaintiff Kelli Wilson Baugh had her Mirena IUD placed by Dr. Anu Chaudry on November 1, 2005.  Ms. Baugh visited Dr. Chaudry again on December 5, 2005 to discuss what she believed to be excessive bleeding.  During the course of the visit, Dr. Chaudry checked Plaintiff's hemoglobin, which was fine, and checked for her Mirena strings – a manufacturer-recommended method of ensuring proper device placement in the uterine cavity.  Over the

course of the next several months, Ms. Baugh continued to experience pain and bleeding, so much so that she sought a second medical opinion from Dr. William Goldstein. (Exhibit 2 Kelli Baugh Dep., at 252-54)

Ms. Baugh first visited Dr. Goldstein on March 24, 2006, complaining of heavy bleeding and significant cramping with her Mirena. Upon examination, Dr. Goldstein could not feel the IUD string, but on ultrasound saw a "dark, white linear line that measures about 2.7 x 2.5 mm" that he believed "to be consistent with an IUD." Indeed, he confirmed that he "did not see anything else that might be consistent with extrauterine IUD." (See Dr. Goldstein Records, at Exh. 3, pp 1-2)  Her assessment included "severe cramping *with* Mirena IUD x 5 months" (emphasis added) and "Lost IUD?" – the first complaint not deemed to be *caused by* Mirena and the second unconfirmed. *Id.* Ms. Baugh's recollection of that visit included Dr. Goldstein being "confident" that her IUD was still in her uterus. (Baugh Dep., at 267)

On March 28, 2006, Ms. Baugh saw Dr. Goldstein to discuss removal of her IUD. Dr. Goldstein wrote "We did an ultrasound and could not definitely identify the IUD within the uterus, although I saw what I thought was the IUD. May need to clear this up with sonohysterography." *Id.,* at Exh. 3, p 3.  Regarding the notation in the record of "the possibility that the Mirena may have perforated the womb," Ms. Baugh testified that Dr. Goldstein explained if he could not remove the Mirena in the office, he needed her permission to "open [her] abdomen and take it . . . out." (Kelli Baugh Dep., at 283).  Ms. Baugh was scheduled to have another appointment on April 4, 2006 but was unable to keep the appointment as she was involved in an auto accident.  She also had concerns that she would be unable to afford the Mirena removal as her Medicaid eligibility had expired. *Id.*

While being evaluated following her car accident, Ms. Baugh understood that an x-ray showed her Mirena to be in place in her uterus.  On a visit to Dr. Goldstein on May 1, 2006, Dr. Goldstein clarified the placement of the IUD.  On that visit, Dr. Goldstein wrote:

> Gyn/Endovaginal Probe Ultrasound: was repeated and I saw what I thought was a IUD in the uterine cavity, as a matter of fact I measured it on the transverse view at 26 mm and another view was 28 mm.  I could see it on both the transverse and sagittal view, a thin line. It did not measure out as thick as I thought it would be, however it seemed to be there.

*Id.*, at Exh. 3, p 4.  Dr. Goldstein summarized the visit by stating "Mirena IUD in place, severe cramping and backache associated with it." *Id.*

On January 23, 2008, Plaintiff again visited Dr. Chaudhry questioning the location of her IUD.  She had a CT scan on January 24, 2008 that confirmed the presence of a "T-shaped IUD in the right lower quadrant. This is clearly outside of the uterus." (See CT scan at Exh. 4)  **This date was the first time the Mirena was *known* to have perforated her uterus.**  Ms. Baugh underwent laparoscopic removal of the Mirena, which was found embedded in her omentum, on January 28, 2008.

Following the Mirena removal surgery, Ms. Baugh continued to experience pain and began seeing Dr. Charles Tatum at McLeod OB/Gyn in August 2008 for treatment.  Dr. Tatum diagnosed Ms. Baugh with endometriosis and adhesions related to her uterine perforation. Following various methods over multiple months of trying to alleviate her pain with no success, Dr. Tatum removed Ms. Baugh's uterus, both fallopian tubes, her left ovary, and excised the endometriosis found around the uterus on March 16, 2010. Dr. Tatum attributed her post-perforation pain and bleeding to the adhesions caused by the Mirena perforating the uterus.  (See letter from Dr. Tatum at Exh. 5)  Despite the drastic measures taken to improve Ms. Baugh's

pain, it continued and she underwent the removal of her remaining ovary on January 3, 2012, placing her in full surgically-induced menopause at age 26.

Ms. Baugh testified that she first thought about filing a lawsuit in October 2008 when Dr. Tatum informed her of "the state that [her] reproductive tract was in." (Kelli Baugh Dep., at 111) She stated, "At that time, I still didn't correlate my injuries to the IUD. Dr. Tatum sat down with me and explained to me what uterine perforation was, what is perforation, things of that nature." (Kelli Baugh Dep., at 111) It was not until after she had her hysterectomy in 2009 that she and her husband realized "everything directly [was] affected and was a result of the Mirena." (Kelli Baugh Dep., at 112).

### III.   ARGUMENT

**1.   Disputed Facts Remain, Making Summary Judgment Improper**

Under the unique facts of this case, the question of whether an objectively reasonable person would have been put on notice of claims arising from Mirena perforation is a disputed question of fact rendering summary judgment inappropriate. *See Mauldin Furniture Galleries, Inc. v. Branch Banking & Trust Co.,* 2012 U.S. Dist. LEXIS 121140, 9-10 (D.S.C. Aug. 27, 2012). (Exh. 6)

The very substance of Defendant's motion reveals that there are questions of material fact that are disputed among the parties. Defendant dedicates six pages of its fourteen page motion to describing the painful and embarrassing symptoms Ms. Baugh experienced beginning 2006, the source of which *she did not know until January 2008* when her Mirena was found to have perforated her uterus. Notably, Defendant fails to provide any facts related to Ms. Baugh's perforated uterus, her diagnosis of endometriosis, her hysterectomy, the removal of her ovaries and fallopian tubes, and her entry into surgically-induced menopause at the age of twenty-six.

Defendant is well aware that these are Mrs. Baugh's most significant damages, most of which arose after the filing of this lawsuit.[1]

### A. No Physician Informed Kelli Baugh That her Mirena was Extrauterine Until January 24, 2008

Defendant first speculates that Ms. Baugh had medical expertise beyond that of her physicians who saw her in 2005 and 2006, and then suggests that she should have ignored the wisdom of those treaters. Treating OB/Gyn Dr. William Goldstein – on at least three occasions – confirmed that Ms. Baugh's Mirena was intrauterine. Plaintiff initially saw Dr. Chaudhry, in late 2005 after her Mirena insertion, and later saw Dr. Goldstein on three occasions in 2006. On each visit these physicians reassured her that her Mirena remained in her uterus, giving her no reason to suspect – and no proof to offer – that she had reason to file suit.

At the time of her visits to Dr. Goldstein, Ms. Baugh had no medical training.[2] Even if a nursing education would have allowed her the foresight to understand the yet undiagnosed source of her pain, she still would not have questioned Dr. Goldstein's findings. Ms. Baugh had no information to suggest that her Mirena had perforated her uterus; it follows that she had no reason to suspect that her Mirena was the source of her pain and excessive bleeding. Defendant's challenge to Plaintiff's representations of fact are questions suitable for a jury, making summary judgment improper.

### 2. Under the Discovery Rule, the Statute Began Running January 24, 2008

Defendant's motion for summary judgment ignores both information on the face of the records and South Carolina's recognition of the discovery rule in products liability actions. Under our discovery rule, the statute of limitations begins to run from the date the injured party

---

[1] Mr. and Mrs. Baugh filed suit January 21, 2011. Ms. Baugh's salpingo-oophorectomy took place January 3, 2012.
[2] Plaintiff currently attends nursing school with plans to graduate next summer.

knows or, by the exercise of reasonable diligence, should know, that a cause of action exists for the wrongful conduct.  S.C. Code Ann. § 15-3-535 (2003).  "Reasonable diligence" means that the "injured party must act with some promptness where the facts and circumstances of an injury would put a person of common knowledge and experience on notice that some right of his has been invaded or that some claim against another party might exist." *Epstein v. Brown,* 363 S. C. 372; 610 S.E.2d 816 (S.C. 2005). "[T]he statute of limitations is **triggered not merely by knowledge of an injury** but by **knowledge of facts, diligently acquired**, sufficient to put an injured person on notice of the existence of a cause of action against another." *True v. Monteith,* 327 S.C. 116, 120, 489 S.E.2d 615, 617 (1997) (emphasis added).

Defendant incorrectly states the applicability of *Tollison v. B&J Machinery Co., Inc.*, 812 F. Supp. 618 (D.S.C. 1993) as a basis for its statute of limitations argument. In *Tollison*, the Plaintiff filed a claim against two defendants – one within the three year statute of limitations and another "more than three years after Tollison's injury."[3]  *Id.*, at 619. The Court found that the discovery rule did not apply to the defendant named outside the three years.  Therefore the "all claims based on that injury" referred to by the court relates to claims of negligence of other defendants, not other problems related to the original injury.

Prior to her January 24, 2008 CT scan, Ms. Baugh exercised diligence to determine whether her Mirena perforated her uterus and was told "no" to each inquiry.  It was not until she discovered her injury, the Mirena was located in her abdomen, that she had notice of her claim. Like on the date of Tollison's injury, it was not until January 24, 2008, Plaintiff "was 'a plaintiff' who could sue and there was 'a defendant' that could be sued." *Tollison,* 812 F. Supp. at 620.

---

[3] Tollison was injured on March 28, 1989, filed suit against one defendant on February 19, 1992, and then tried to add another defendant on November 3, 1992 – more than three years from the date of injury.

Contrary to Defendant's assertion, Plaintiff neither claimed ignorance nor had actual or constructive knowledge of her perforation before that date, and indeed took exhaustive steps to investigate whether her Mirena had perforated her uterus before January 2008.

Before becoming aware of the uterine perforation of her Mirena, Ms. Baugh was similarly unaware that the foreign Mirena created adhesions, the source of some of her intense pain. Any suspicions she had that her pain was related to a *perforation* of her IUD were dismissed by her physicians and the imaging they conducted. Knowledge about her *pain and bleeding* before January 24, 2008 is in no way tantamount to knowledge of a *perforation*. She had no way of attributing any complaints to the perforation of her Mirena until it was positively identified extrauterine on January 24, 2008.

### 3. The Statute of Limitations Began Running for Mr. Baugh upon the Discovery of the Perforation

While Mr. Baugh may have believed Ms. Baugh's pain and bleeding to be associated with the mere existence of the Mirena, he had no ability to relate those problems to a *perforation* until *after* the perforation was discovered. Furthermore, that perforation led to Ms. Baugh's endometriosis and adhesions and required her hysterectomy, an event that occurred well within the three year statute of limitations. Mr. Baugh testified that his inability to have more children with his wife has affected him. (Exh. 7 Justin Baugh Dep., at 43) He also testified that he is impacted his wife's "lack of drive, energy, . . . from getting up and doing what needs to be done," confirmed to be related to her Mirena by Dr. Tatum *after* the perforation was discovered. (*Id.,* at 48-49)

### A.   Mr. Baugh's Call to Bayer Did Not Start the Clock

Mr. Baugh decided to call Bayer in December 2007 not because he suspected his wife's Mirena perforated her uterus, but because "the sexual relationship had gotten so bad and the emotional disconnect was so bad that I finally, you know – I guess I reached out and just kind of wanted some answers to know if everything was on par." (*Id.*, at 63) He had no way of knowing on that date – and nothing informed him during the conversation with the Bayer representative – that Ms. Baugh's Mirena resided in her abdominal cavity, or that her "excruciating pain" was related to endometriosis and adhesions created by the perforation of her uterus. Mr. Baugh "left the conversation with the woman on the phone reassured that [he and Ms. Baugh] were doing fine, everything was on track, nothing was abnormal." (*Id.*, at 66)  It was only after imaging confirmed the Mirena outside Ms. Baugh's uterus that Mr. Baugh related all of her former problems to the perforation, not to the simple presence of the device itself.

### CONCLUSION

Ms. Baugh's claims stem from the perforation of her uterus by a Mirena IUD.  The perforation was discovered on January 24, 2008.  This lawsuit was filed on January 21, 2011, within the three year statute of limitations.  No act, information, or occurrence before January 24, 2008 started the statute of limitations running in this action.  Before this date, Mr. and Ms. Baugh had no way of knowing that Ms. Baugh's Mirena had perforated her uterus.  It follows that before that date, neither had any way of knowing that the complaints were related to the *perforation* of the Mirena, not the existence of the Mirena itself.  Any question as to the circumstances under which the statute of limitations was triggered is appropriate for a jury.  For each of these reasons, Defendant's motion should be denied.

                                      Respectfully submitted.

September 17, 2012                    /s/ Carmen S. Scott
                                      Carmen S. Scott, Esq.
                                      cscott@motleyrice.com
                                      Fred Thompson, III, Esq.
                                      fthompson@motleyrice.com
                                      Motley Rice LLC
                                      28 Bridgeside Blvd.
                                      Mt. Pleasant, SC 29464
                                      T: 843-216-9000
                                      F: 843-216-9440

                                      J. Thomas McBratney, III
                                      McBratney Law Firm, P.A.
                                      P.O. Box 3890
                                      Florence, SC 29502
                                      T: (843) 662-8155
                                      F: (843) 662-1144
                                      tm.mcbratneylawfirm@gmail.com

                                      Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

      I hereby certify that on September 17, 2012, I served the foregoing Plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment via electronic mail and regular mail upon the following:

Andrew G. Melling, Esquire
Celeste Tiller Jones, Esquire
McNair Law Firm, P.A.
PO Box 11390
Columbia, SC 29211

                **MOTLEY RICE, LLC**

                /s/ Carmen S. Scott
                  Carmen S. Scott